UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| NATIONAL CREDIT UNION ADMINISTRATION, as liquidating agent for the NEW LONDON SECURITY FEDERAL CREDIT UNION,<br>　　　　Plaintiff,<br>v.<br><br>WELLS FARGO ADVISORS, LLC, as successor in interest to WACHOVIA SECURITIES, successor in interest to A.G. EDWARDS & SONS, INC.,<br>　　　　Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:　　No. 3:10-cv-00143-WWE |

**MEMORANDUM OF DECISION ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

　　This is an action by the National Credit Union Administration Board ("NCUA"), in its capacity as liquidating agent for the New London Security Federal Credit Union, asserting causes of action relating to the insolvency and liquidation of the Credit Union.  Both parties have filed motions for summary judgment.

**BACKGROUND**

　　The NCUA is the independent federal agency that regulates, charters and supervises federal credit unions.  The NCUA operates and manages the insurance fund that insures the deposits of account holders in all federal credit unions.

　　Defendant Wells Fargo is the successor in interest to Wachovia Securities, LLC, successor in interest to A.G. Edwards & Sons, Inc. ("AGE").

　　Prior to its demise in 1988, Moseley Securities was a regional securities broker-dealer operating 28 retail branch offices in the United States and four offices in Europe.  In addition to retail brokerage, Moseley conducted principal transactions in securities as a market maker and

dealer in over-the-counter equity and debt securities; acted as sponsor and underwriter of municipal unit investment trusts and engaged in risk arbitrage transactions; acted as a manager, underwriter and member of selling groups for public offerings of corporate securities and participated as an underwriter in municipal syndicates; and acted as financial adviser and placement agent to corporate clients in private placement and merger and acquisition transactions.

In 1988, Moseley Securities liquidated its retail brokerage operations. Moseley sold its branch offices to a number of broker-dealers. AGE was one among the group of broker-dealers that acquired Moseley branch offices. AGE purchased Moseley's New London Office along with five other branches in various locations. AGE did not purchase any of Moseley's non-retail brokerage assets, such as its investment banking business, investment advisory assets, institutional mortgage-backed securities operations, municipal bond operations and international securities trading and research business.

When AGE bought the New London Office, the name of the office changed from Moseley to AGE, but the employees of that office remained in the same building and continued on working as they had before.

On July 28, 2008, the NCUA Board determined that the Credit Union was insolvent as defined by 12 C.F.R. § 700.2(e)(1), placed the Credit Union into involuntary liquidation and appointed itself liquidating agent of the Credit Union. The insolvency determination was based on the discovery that the Credit Union's largest asset (i.e. approximately $12 million in investments held in an investment account at AGE/Wachovia) did not exist. Specifically, in July 2008, NCUA examiner, Gary Meisinger, spoke with Sherry Nordeng, the manager of

AGE/Wachovia, who confirmed that AGE/Wachovia had no record of an investment account belonging to the Credit Union.

It was later discovered that the account number that was believed to have been owned by the Credit Union was, according to AGE/Wachovia's records, owned by an entity called Elmore Shoe Company. Elmore Shoe Company was a women's shoe store in New London, Connecticut, that had gone out of business some time prior to 1968. Elmore Shoe Company was owned by the father-in-law of AGE/Wachovia employee Edwin Rachleff ("Rachleff").

Rachleff was an investment broker/financial advisor/registered representative employed by AGE from on or about February 1988, and subsequently for Wachovia following Wachovia's acquisition of AGE in 2007, until his suicide on July 28, 2008. Rachleff, as registered representative of AGE, had the ability and the means to assist clients in opening and managing investment accounts. Rachleff served as the longtime investment broker for the Credit Union.

Between April 1988 and June 2008, the Credit Union received account statements and trade confirmations from Rachleff, which statements and confirmations reflected that the Credit Union owned millions of dollars in assets that were held in an investment account at AGE. Specifically, the April 1988 statement showed that the Credit Union had approximately $4.8 million in assets in an investment account at AGE. The June 2008 statement showed that the Credit Union had approximately $11.8 million in assets in an investment account at AGE.

After the NCUA Board placed the Credit Union into involuntary liquidation and appointed itself liquidating agent of the Credit Union, it appointed Busola Oke as its agent. Ms. Oke is the Director of Finance for the Asset Management and Assistance Center ("AMAC"),

which is an office of the NCUA. Ms. Oke has worked for AMAC since 2001. AMAC handles the liquidation of federally-insured credit unions, including, when appropriate, the payout of funds from the Insurance Fund to credit union members.

As Plaintiff's agent, Ms. Oke, along with her team at AMAC, were responsible for liquidating the Credit Union and overseeing the payment of insurance funds to members of the Credit Union. In carrying out these functions, Ms. Oke and her team followed AMAC's normal procedure for paying out insurance proceeds. Pursuant to that procedure, they (a) gathered the Credit Union records and other available data regarding the member accounts; (b) verified that the amounts in each member account balanced out to the Credit Union's general ledger; and (c) determined which accounts qualified for insurance coverage and in what amounts based on the applicable statutes, regulations and share insurance limit.

On August 3, 2008, the FBI opened a new investigative matter in order to locate and prosecute any individual who assisted Rachleff in perpetrating the fraud against the Credit Union. The FBI's investigation lasted over 19 months and included numerous interviews of Rachleff's business associates, friends and family members. In addition, the FBI subpoenaed documents and conducted a financial investigation. The FBI's investigation ultimately revealed that Rachleff acted alone in connection with the fraud. Accordingly, on March 15, 2010, the FBI closed its investigation into this matter.

## DISCUSSION

A motion for summary judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "Only when reasonable minds could not

differ as to the import of the evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.), cert. denied, 502 U.S. 849 (1991).

The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. American International Group, Inc. v. London American International Corp., 664 F.2d 348, 351 (2d Cir. 1981). In determining whether a genuine factual issue exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. Celotex Corp., 477 U.S. at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. Anderson, 477 U.S. at 249.

**Defendant's Motion for Summary Judgment [Doc. #229]**

First, defendant argues that AGE did not become the successor-in-interest to Moseley by virtue of its acquisition of Moseley's New London, Connecticut, office. Accordingly, defendant contends that it cannot be held liable for any damages arising out of Rachleff's fraudulent conduct in the period before he worked with AGE, while he was employed by Moseley.

Second, defendant argues that the Credit Union did not sustain any compensable losses during the period it erroneously believed that it held an investment account with AGE, as more money was returned to the Credit Union than was placed in Rachleff's care by the Credit Union during the period Rachleff was employed by AGE.

**Successor Liability**

Connecticut follows the general common law rule of successor liability, whereby:

> [A] corporation which purchases all the assets of another company does not become liable for the debts and liabilities of its predecessor unless (1) the purchase agreement expressly or impliedly so provides; (2) there was a merger or consolidation of the two firms; (3) the purchaser is a "mere continuation" of the seller; or (4) the transaction was entered into fraudulently for the purpose of escaping liability.

Call Center Technologies, Inc. v. Grand Adventures Tour & Travel Pub. Corp., 635 F.3d 48, 52 (2d Cir. 2011); see also Kendall v. Amster, 108 Conn. App. 319, 332 (2008).

Plaintiff argues that defendant is the successor-in-interest to Moseley's New London, Connecticut, brokerage business on account of the fact that AGE purchased that business and then continued to operate it just as Moseley had before – with the same office, employees, manager, and customers. Indeed, under the "continuity of enterprise" theory followed in Connecticut, successor liability may be found where "the successor maintains the same business, with the same employees doing the same jobs, under the same supervisors, working conditions, and production processes, and produces the same products for the same customers." Chamlink Corp. v. Merritt Extruder Corp. 96 Conn. App. 183, 189 (2006).

Defendant submits that AGE was not a successor-in-interest to Moseley, as AGE acquired only a small portion of Moseley's business (six of twenty-eight branch retail branch offices), and the acquisition of Moseley represented only a small portion of AGE's long established securities broker-dealer business. Nevertheless, it is not disputed that the portion of Moseley that AGE did acquire, the New London branch office, continued its enterprise with regard to all relevant factors cited in Chamlink. Thus, the issue becomes whether the continuity of enterprise theory is defeated by defendant's proportionality argument. The Court finds that it is not.

Defendant cites Kendall for the proposition that AGE's acquisition of "just one of Moseley'[s] multiple business lines" is "hardly what is necessary" to show that AGE was Moseley's successor-in-interest.  However, Kendall does not discuss proportionality.  See 108 Conn. App. at 332.  There, the court found that "Red Line was nothing more than a continuation of Hyannis Restorations, and thus subject to successor liability" where "Red Line was in the same business, restoring rare, expensive, vintage automobiles; used the same personnel, namely, Bruce Amster and Colton Amster; and had the same customers."  Id.  Here, AGE acquired 100% of Moseley's New London brokerage business.  AGE continued to run that business out of the same office.  All of the employees who worked at Moseley's New London brokerage business, including the supervisor, Charles Poole, continued on at AGE performing the same jobs.

The Court is not persuaded by defendant's effort to compartmentalize Moseley's and AGE's business.  There is neither legal justification nor logical premise for the proposition that successor liability cannot attach to a smaller unit of a larger business.

> [Defendant's] position, moreover, makes little sense in the context of modern business, where a corporation might easily sell an entire division and carry on dutifully in another area. The reasonable business expectations of those who relied upon the spun-off division are no less worthy of continued protection, nor is the risk of intentional evasion of pre-existing contractual and tort obligations lower, simply because the original stockholders were wise enough to have diverse interests.

Kock Materials Co. v. Shore Slurry Seal, Inc., 205 F. Supp. 2d 324, 337 (D.N.J. 2002). Accordingly, defendant's motion to deny successor-in-interest status will be denied.

**Damages During Rachleff's Employment at AGE**

Defendant argues that plaintiff suffered no compensable harm during the period that Rachleff was employed by AGE, asserting that, during that period (1988-2008), Rachleff

7

returned to the Credit Union a total of $5,009,275.66, while the Credit Union sent AGE funds totaling $1,789,097.61. The Court's decision regarding successor-in-interest liability renders this portion of defendant's motion for summary judgment moot with regard to the ultimate determination of defendant's liability. However, the Court notes that defendant's "money-in/money-out" argument was unlikely to succeed, as money is fungible and the sources and ownership of the various funds is in dispute. If Rachleff misappropriated $1,789,097.61 during his tenure with AGE, that he returned excessive amounts during that time is not dispositive of damages where insurance claims and uninsured shares total more than ten million dollars. The parties fundamentally disagree as to how damages should be calculated in this case. The amount of loss is a material fact genuinely in dispute.

Defendant is free to demonstrate that plaintiff suffered no loss, and plaintiff will be left to its proof of establishing compensable losses. Defendant's motion to preclude damages for the period that Rachleff was employed by AGE will be denied.

### Plaintiff's Motion for Partial Summary Judgment [Doc. #230]

Plaintiff requests partial summary judgment to eliminate defendant's affirmative defenses numbered three through nine. Defendant contests summary judgment as to defenses three through six. Accordingly, defenses seven through nine will be deemed withdrawn.

### Third Affirmative Defense: No Net Losses

Defendant's third affirmative defense states:

> Plaintiff suffered no damages, since the amounts returned to [the Credit Union] by [AGE] were greater than the amounts invested by [the Credit Union] at [AGE].

As discussed above, the amount of plaintiff's damages, if any, is a disputed issue of

material fact.  Plaintiff will be left to its proof, and defendant may introduce evidence to demonstrate that plaintiff was not damaged.  Accordingly, plaintiff's motion will be denied as to defendant's third affirmative defense.

### Fourth and Fifth Affirmative Defenses: Contributory Negligence

Defendant's fourth and fifth affirmative defenses contend that the Credit Union was contributorily negligent in its supervision of Rachleff and, therefore, partly responsible for its own losses.

Plaintiff argues that (1) expert testimony is required to prove contributory negligence in this case, and defendant failed to proffer an expert witness who is qualified to offer opinions on this matter, and his opinions are otherwise inadmissible; and (2) defendant cannot prove the required elements of negligence: duty, breach, and causation.

"If the determination of the standard of care requires knowledge that is beyond the experience of an ordinary fact finder, expert testimony will be required." Keeney v. Mystic Valley Hunt Club, Inc., 93 Conn. App. 368, 375 (2006).  Plaintiff contends that defendant's expert, Mr. Herrling, is not qualified to offer expert opinions about the standard of care to which credit unions must adhere with respect to safeguarding their investment accounts because Mr. Herrling has no experience or training in this area.

Defendant responds that Mr. Herrling is qualified to testify about the standard of care applicable to the Credit Union's Board and Supervisory Committee.  Mr. Herrling has 34 years of experience in managerial level positions within the credit union industry, including supervisory committee experience and consultancy work.  Defendant further contends that it does not take specialized knowledge beyond the experience of an ordinary juror to understand and

evaluate the evidence demonstrating the failures of the of the Credit Union.

Rule 26(a)(2)(B)(i) requires a "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i). Mr. Herring will be limited to testimony concerning his expert report. Plaintiff can attack defendant's expert on cross examination concerning his credentials to make certain findings. Accordingly, plaintiff's motion will be denied as to defendant's fourth and fifth affirmative defenses. The Court will visit this issue in more detail when addressing plaintiff's motion to preclude from trial defendant's expert report and testimony.

**Sixth Affirmative Defense:**

Defendant's sixth affirmative defense states:

> NCUA, in its role as liquidating agent, paid claims without proper documentation or testimony to support their validity.

Defendant argues that the procedure for paying out insurance claims was inadequate because the investment accounts and the assets reflected in Rachleff's bogus account statements never existed and no investment account was ever opened in the name of the Credit Union with AGE. Defendant contends that "[i]n light of its knowledge that the assets upon which the Credit Union based its records of member accounts did not exist, the Liquidating Agent should have conducted a more extensive investigation into the propriety of making insurance payments to Credit Union members." Defendant essentially argues that it was improper for the Liquidating Agent to reimburse defrauded account holders where purported account balances were pure fiction. The Court is not persuaded.

To facilitate the prompt payout of insured balances to members, the Code of Federal

10

Regulations provides that "account records of the insured credit union shall be conclusive as to the existence of any relationship pursuant to which the funds in the account are deposited and on which a claim for insurance coverage is founded." <u>Waukesha State Bank v. National Credit Union Admin. Bd.</u>, 968 F.2d 71, 73 (D.C. Cir. 1992) (quoting 12 C.F.R. § 745.2(c)).  Moreover, "[f]or the purpose of determining insurance coverage, dividends earned in the ordinary course of business and posted to share accounts for any prior accounting or dividend period shall be deemed to be principal under this part."  12 C.F.R. § 745.200(b).

In carrying out these functions, the NCUA team followed normal procedure for paying out insurance proceeds. Pursuant to that procedure, they (a) gathered the Credit Union records and other available data regarding the member accounts; (b) verified that the amounts in each member account balanced out to the Credit Union's general ledger; and (c) determined which accounts qualified for insurance coverage and in what amounts based on the applicable statutes, regulations and share insurance limit.

Defendant's generalized argument that plaintiff should have performed some unspecified further level of diligence fails, as it would undermine the insurance of deposits of account holders in all federal credit unions.  Virtually all embezzlement involves efforts to conceal the theft by creating records of accounts that, in reality, "did not exist."  Defendant's implicit argument that plaintiff should have performed some sort of financial gymnastics to determine which monies should have existed apart from the theft cannot stand where no statute or caselaw supports such a duty.  Accordingly, plaintiff's motion for summary judgment will be granted as to defendant's sixth affirmative defense.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is DENIED. Plaintiff's motion for summary judgment is DENIED as to defendant's third, fourth, and fifth affirmative defense and GRANTED as to defendant's sixth affirmative defense.

Dated this 30th day of September, 2015, at Bridgeport, Connecticut.


    /s/Warren W. Eginton
WARREN W. EGINTON
SENIOR UNITED STATES DISTRICT JUDGE